**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| SCOTT EGBERT, JANELLE EGBERT, | No.  60448-5-II |
| Respondent, | |
| v. | ORDER AMENDING OPINION TO CORRECT CAPTION |
| RICHARD JORGENSEN, HAILY JORGENSEN, and ALL OTHER RESIDENTS, and OCCUPANTS, | |
| Appellants | |
| . | |

The Court on its own motion amends the published opinion in part filed on December 9, 2025, to correct the caption to PUBLISHED OPINION.  No other portion of the opinion is amended.  Accordingly, it is

**SO ORDERED.**

**PANEL:**  Jj. MAXA, LEE, PRICE

**FOR THE COURT:**

_____
PRICE, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SCOTT EGBERT, JANELLE EGBERT, | No. 60448-5-II |
| Respondents, | |
| v. | |
| RICHARD JORGENSEN, HAILY JORGENSEN, and ALL OTHER RESIDENTS, and OCCUPANTS, | UNPUBLISHED OPINION |
| Appellants. | |

PRICE, J. — The Jorgensens were evicted when their landlords, the Egberts, gave them notice that Scott Egbert wanted to move into the residence. Following a show cause hearing, the superior court granted a writ of restitution that restored possession of the property to the Egberts. The Jorgensens appeal, claiming that the eviction was the result of retaliation for their complaints about the property, including alleged issues with the septic system. Both parties also raise numerous issues beyond the issuance of the "Writ of Restitution,"[1] such as whether the Jorgensens owed the Egberts rent or whether the Egberts neglected to fix the septic issues. In addition, the parties disagree on the appropriate standard of review for the superior court's decision following the show cause hearing. The Jorgensens contend that we should apply a de novo standard of review; the Egberts contend we should apply an abuse of discretion standard.

---

[1] Clerk's Papers at 281-85 (Findings of Fact and Conclusions of Law, Judgment and Order for Writ of Restitution (July 8, 2024)).

Notwithstanding the various issues raised by the parties, the narrowness of the superior court's order limits our review to the issuance of the Writ of Restitution. For this specific decision—a decision related to a writ of restitution at a show cause hearing—we hold that the appropriate standard of review is abuse of discretion. Applying this standard to the specific facts of this case, including that the eviction was based on the owner needing to occupy the property, we hold that the superior court did not err. Thus, we affirm and award attorney fees on appeal to the Egberts.

## FACTS

### I. BACKGROUND

Scott and Janelle Egbert have owned the property on East Road of Tralee in Shelton since around 2018. Scott suffers from mental health and drug use challenges, so Scott's mother, Fay Jackson, acts as Scott's attorney-in-fact and helps him manage his properties and affairs. Jackson also acted as Janelle Egbert's attorney in fact. During the entire time that the Egberts have owned the Tralee property, Richard and Hailey Jorgensen have been tenants there. As of December 2021, the Egberts charged the Jorgensens $1,450 in monthly rent.

### A. THE JORGENSENS' RENTAL PAYMENTS BETWEEN DECEMBER 2021 AND AUGUST 2023

In December 2021, the Jorgensens stopped paying their rent. In February 2022, the Jorgensens obtained rental assistance and were able to pay $4,800 to the Egberts, which covered the missing rent and late fees. However, the Jorgensens did not make any additional rental payments for the next 15 months.

In June 2023, the Egberts sent the Jorgensens a proposed repayment plan agreement for catching up on the overdue rent. In the agreement, the Jorgensens would be required to pay

$1,933.33 each month starting August 1 until the overdue rent was paid in full. Our record does not include a signed copy of this agreement or a confirmation that the parties actually executed it.

In July 2023, the Jorgensens obtained additional rental assistance and paid $17,930 to the Egberts. Despite the large payment, the Egberts issued the Jorgensens a notice to pay their overdue rent or vacate the property. The notice stated that even with the Jorgensens' most recent payment, they still owed $11,370 in overdue rent. The Jorgensens did not make any additional rental payments to the Egberts after this July payment and did not vacate the property.

B. THE PROPERTY'S SEPTIC PROBLEMS IN AUGUST 2023 AND THE JORGENSENS' DEMAND LETTER

In August 2023, the Jorgensens experienced problems with the septic system on the property. They reported to Mason County Public Health and Human Services that their septic system had overflowed and had flooded the backyard. The Jorgensens personally paid AAA Septic LLC to pump the septic system.

The county subsequently issued two notices in August and September 2023, stating that the septic system violated state and county code. The notices were addressed to the Egberts and Jackson at a P.O. Box. AAA septic pumped the septic system again in October 2023, and again, the Jorgensens paid for the service.

On December 12, 2023, the Jorgensens, through counsel, sent a demand letter addressed to the Egberts and Jackson. The letter alleged that the Egberts' failure to repair the property's septic system violated the Residential Landlord-Tenant Act of 1973 (RLTA).[2] The letter also alleged

---

[2] Ch. 59.18 RCW.

that following the Jorgensens' complaints to the county health department, Jackson had harassed them and violated their right to quiet enjoyment.

C. SCOTT EGBERT'S INCARCERATION AND TREATMENT AT WESTERN STATE HOSPITAL

Meanwhile, in January 2023, Scott Egbert had been charged with multiple crimes that led to his incarceration. Due to Scott's drug addiction and mental health issues, he was eventually found to be incompetent to stand trial. He was admitted to Western State Hospital (WSH) and remained there, undergoing treatment, until his release in December 2023.

II. THE EGBERTS BEGIN THE EVICTION PROCESS

On December 28, 2023, the same month as Scott's release from WSH, the Egberts served the Jorgensens with a 90-day notice of termination of the lease. The December 28 notice stated that the Jorgensens' lease was being terminated because Scott Egbert sought to reside at the property after his release from WSH. The notice stated,

> There is no substantially equivalent unit available in the same building. Scott Egbert is the owner of the property and has been incarcerated and admitted to Western State Hospital. He has nowhere to live upon his release from incarceration. His release is imminent. His intent and plan is to move into his home as his permanent residence.

Clerk's Papers (CP) at 40-41.[3]

Despite the notice, the Jorgensens continued to occupy the property. In April 2024, the Egberts served the Jorgensens with a complaint and summons for unlawful detainer based on the

---

[3] On December 28, the Egberts also served the Jorgensens a 30-day notice to vacate due to their overdue rental payments. Because, as shown below, the superior court based its decision solely on the 90-day notice, this notice is not part of this appeal.

Jorgensens failure to comply with the eviction notice. The Egberts promptly moved for a show cause hearing.

III. THE JORGENSENS' RETALIATION CLAIM

In their answer, the Jorgensens raised a retaliation defense. The Jorgensens argued that the Egberts' claimed basis for terminating their lease, that Scott intended to move into the Tralee property after his release from WSH, "was issued as pretext to retaliate against [the Jorgensens'] lawful demands to repair the septic system that was a public health hazard and nuisance." CP at 75.

The Jorgensens contended that Scott owned six other properties in Shelton, and thus he had no good faith intention or reason to reside at the Tralee property. The Jorgensens also asserted that in a September 2023 mental health evaluation from WSH, Scott had represented that following his release from WSH, he intended to return to a different property, specifically his previous home in Shelton where he had been living prior to his incarceration.

A. DECLARATION FROM HAILEY JORGENSEN

Hailey Jorgensen submitted two declarations in support of the retaliation claim. Hailey admitted that in December 2021, she and her husband had fallen behind on their rent. She stated that she had communicated with Scott about applying for rental assistance in order to pay him the rent that they owed. In February 2022, she received rental assistance and her housing case manager made a payment to Scott. She applied again for additional rental assistance in April 2022.

Hailey also stated that the property's septic system flooded the yard in August 2023. She explained that because the Egberts and Jackson "were refusing to do anything," she contacted Mason County Health Department. CP at 88. At the county's direction, a septic company came

out to the property, inspected the system, and pumped it. Hailey stated that around the time that the county was issuing violation notices to the Egberts, Jackson began harassing them by sending Hailey offensive text messages and by coming to the Tralee property at night.

Hailey also said that in September 2023, the water at the property tested positive for E. coli and the health department told them that they could not drink it. Hailey said that because of this, she and her husband were afraid of contamination and "avoid[ed] taking showers at home, using [their] dishwasher, and washing clothes." CP at 89. And in October 2023, they had to get their septic system pumped again, which they paid for with their own money. Hailey stated that when she told Jackson about these problems, Jackson "refused to have the system inspected and told [them] that she would not spend another dime on [them]." CP at 89.

Hailey said that because their home was "basically [un]inhabitable," they contacted an attorney through Thurston County Volunteer Legal Services. CP at 90. Their attorney sent the Egberts a letter in December 2023, demanding that the Egberts fix the septic system and demanding that Jackson stop harassing them.

B. SUPPORTING DOCUMENTS

In addition to Hailey's declaration, the Jorgensens submitted multiple documents to support their retaliation claim. Among other documents, they submitted the following.

1. Scott Egbert's Forensic Mental Health Evaluation from WSH

The Jorgensens attached a copy of Scott's forensic mental health evaluation filed September 5, 2023, to show that he was not initially intending to reside at the Tralee property. The evaluation stated, "[Scott] lives in a home that he owns in Shelton and will return there when released from custody." CP at 217.

6

2. Records from Septic Company Called by the Jorgensens

The Jorgensens submitted the notes and receipts from the septic company, AAA Septic, that confirmed that the Jorgensens used their services in August and October 2023. In AAA Septic's notes, the company staff explained that they had attempted to contact Jackson before coming out to the property, but she had not answered their calls.

> [W]e were called by the health department on this property (after informing the tenants of this policy), as the tenants were trying to get service, but the property owner was in prison, and his mother who has [power of attorney] would not answer calls, and if she did, would just hang up on us. Since the health department requested assistance, we went ahead and provided service, as long as the tenants agreed to pay us directly.

CP at 193.

Additional records from the company stated that AAA Septic had come out to inspect the property in August 2023 and October 2023. In August, "the tenants paid for an emergency pump out service" and in October 2023, they had paid again "for another emergency pump out due to the failed system." CP at 193. The notes further stated,

> The system has been a failure since the August pump out, when we noted that the pump is not operational, deeming the system pretty much unusable without needing to be pumped continually.

CP at 193.

3. Notices from Mason County Public Health and Human Services

The Jorgensens submitted the two notices from August and September 2023 from Mason County Public Health and Human Services regarding the Jorgensens' complaints about the Tralee property's septic system. The notices stated that the county had found that the Egberts were in violation of state and county health codes for "Inadequate or illegal connection to On-Site Sewage

7

System" and "Use of malfunctioning Onsite Sewage System." CP at 206, 209 (boldface omitted). Both notices were addressed to the Egberts and Jackson at "PO BOX 1457 SHELTON, WA 98584." CP at 206, 209.

4. Demand Letter from the Jorgensens' Attorney

The Jorgensens submitted the demand letter sent by their attorney from Thurston County Volunteer Legal Services and addressed to Scott and Janelle Egbert and to Jackson. The letter listed Scott's address as the Mason County Jail, Janelle's address as the P.O. Box 1457, and an address for Jackson that appears to be a residence in Shelton.

The letter alleged that the Egberts were in violation of the RLTA for failure to repair the property's septic system and for Jackson's harassment. The letter requested that "repairs be commenced to address the failing septic system, which is causing a health and safety issue." CP at 213. The letter also stated that if the Egberts did not address the septic issues, the Jorgensens would take legal action "including paying rent into escrow, filing an action in Small Claims Court for diminished rental value and constructive eviction, and seeking damages for relocation assistance." CP at 213 (boldface omitted).

Regarding the allegations against Jackson, the letter alleged that Jackson's "[u]nannounced visits and abusive language [were] infringing on [the] Jorgensen[s'] right of quiet enjoyment." CP at 214. The letter advised that if Jackson was acting on the Egberts' behalf, then they would be potentially liable for legal action.

5. Documents Confirming the Egberts' P.O. Box

The Jorgensens attached copies of search results from a Mason County Assessor's Office-related website that showed that P.O. Box 1457, Shelton, WA was the address associated with Scott and Janelle Egbert.

IV. THE EGBERTS' RESPONSE TO THE JORGENSENS' RETALIATION CLAIM

A. DECLARATION OF SCOTT EGBERT

Scott filed a declaration refuting the alleged retaliation. Addressing his reasoning for evicting the Jorgensens, he explained that he decided to reside at the Tralee property in fall 2023 so that he could "get [his] life back in order" after being released from WSH. CP at 249. He explained that residing at that property was "the only feasible option" because he was unable to live at any of the other properties that he owned. CP at 249. Scott's declaration listed each of his properties and explained why he could not live at any of them.

> • 603 King Street, Aberdeen, WA 98520. This property has been vacant and debilitated for years. The City of Aberdeen has deemed it un[in]habitable. Nothing works on the inside, it's rotting, and walls, floors, and ceilings are covered in mold from moisture damage.
>
> • 280 Mt. WA, Hoodsport, WA 98548. This property burnt down in December of 2023. My wife's boyfriend set it on fire. There is a pending arson trial.
>
> • 1904 Laurell Street, Shelton, WA 98584. This property not only has two mortgages in default, but the city police have taped it off not letting anyone inside because no one may reside there because the kitchen caught on fire and burnt down a good portion of the home. It is uninhabitable.
>
> • 1201 Dickenson Street, Shelton, WA 98584. The house has been uninhabitable for over [a] year. All of the windows were broken. It has been looted and raided by thieves. All of the electrical wires have been stripped and stolen for their copper value. It is also in foreclosure and it is completely trashed.
>
> • 1127 Dickenson Street, Shelton, WA 98584. This property is one of two properties with renters that have consistently paid rent. I desperately need this rental income because there is a loan on the property that I have to pay and because I need money to eat and live off of.

 • 300 Badger Lane, Shelton, WA 98584.  This is the other property with renters that have paid rent.  I desperately need this rental income because there is a loan on the property that I have to pay and because I need money to eat and live off of.  It's not a very nice home, it's a manufactured home and needs a lot of work, and I would not want to live there anyway.

CP at 248-49.

Scott's declaration also stated that he never received any of the notices from Mason County Public Health and Human Services or the Jorgensens' attorney about the Jorgensens' complaints. He stated that he never had a P.O. Box address and that he never received the notices while he was in jail.

B.  DECLARATION FROM FAY JACKSON

Jackson submitted two declarations in support of the unlawful detainer action that largely corroborated Scott's declaration.  She explained that due to Scott's problems with drugs, she helped him keep track of his properties and affairs and was familiar with the Tralee property and the Jorgensens.

Jackson denied being told of the Jorgensens' septic problems and stated that neither she nor Scott had ever received contact from Mason County's public health department and that Scott did not use the P.O. Box listed on the notices.  Jackson also corroborated Scott's reasons for why he was unable to reside at any of his other properties in Shelton.

C.  DECLARATION FROM MIKE FESENBEK

The Egberts also submitted a declaration from Mike Fesenbek, a septic operator not affiliated with AAA Septic, who inspected the Tralee property's septic system in July 2024 after the start of the eviction proceedings.  Fesenbek's declaration stated that when he inspected the Tralee property, "[e]verything about the septic system was working and functioning well."  CP at

272.  Based on Fesenbek's inspection, "[t]here was no sewage leaking or pumping issues," and "[t]here were no signs of any previous septic sewage overflows."  CP at 272.

Fesenbek also declared that although during the inspection the Jorgensens had told him that "[they] had seen sewage coming out of a riser lid," he observed "no signs that this had occurred, neither in the present nor in the past."  CP at 273.  He explained,

> If any leakage or sewage did come from the lid, this would be because there was [a] clog or blockage in the system coming from the house, caused by too much toilet paper, or the like, being flushed down into the system.  This type of system is not prone to clogging in that fashion other than from misuse and flushing too much paper or other things down toilets.

CP at 273.  Fesenbek also expressed surprise that the previous inspection report had said that the Tralee property's septic system "needed floats and a pump," because the type of septic system at the property "does not operate utilizing floats at all."  CP at 273.

V.  SHOW CAUSE HEARING

The superior court held a show cause hearing on the Egberts' motion for a writ of restitution in July 2024.  During the hearing, the superior court heard arguments and asked the parties questions.

A.  THE EGBERTS' ARGUMENTS

The Egberts argued that they had a good faith basis for evicting the Jorgensens.  They pointed to Scott's sworn declaration that he made the decision in fall 2023 to live at the Tralee property upon his release from WSH.  They also argued that because the Jorgensens were behind on rent payments, there was a rebuttable presumption under the RLTA that their decision to evict the Jorgensens was not retaliatory.

11

The Egberts also questioned the veracity of the Jorgensens' retaliation claim. They argued that neither they nor Jackson had ever received notice from the county public health department or the demand letter from the Jorgensens' attorney about the septic problems. Additionally, the Egberts argued that the Jorgensens' claims regarding the septic problems were "a bit questionable" based on Fesenbek's declaration that suggested that the Tralee property had no on-going problems and that any issues were likely due to the Jorgensens' misuse. Verbatim Rep. of Proc. (VRP) (July 8, 2024) at 10.

The Egberts also argued that the superior court should issue the Writ of Restitution and rule in favor of the Egberts at the show cause hearing without setting the matter for trial. They argued that although the RLTA required the superior court to determine whether genuine issues of material fact existed that necessitated trial, the superior court should weigh the evidence, unlike what typically occurs at summary judgment. They contended,

> It's not a summary judgment standard. This case—this Court does have the power to weigh evidence and make a ruling. And in this case you've got—you go to trial on this and there's really nothing new that's going to pop up.

VRP (July 8, 2024) at 27.

B. THE JORGENSENS' ARGUMENTS

The Jorgensens also encouraged the superior court to "weigh the veracity of the pleadings." VRP (July 8, 2024) at 16. The Jorgensens asked the superior court to reject the notion that "the exclusive remedy" in this case would be for the Jorgensens to vacate the Tralee property and for the parties to "wait to see" if Scott actually moved into the property within 60 days. VRP (July 8, 2024) at 16. Instead of assuming that Scott actually desired to move into the Tralee property and

had no other options, the Jorgensens urged the superior court to consider the evidence that undercut this claim.

The Jorgensens then pointed to Scott's admission in his mental health evaluation that he intended to return to a different residence, not the Tralee property. However, the superior court interrupted and questioned whether Scott living in this previous residence was actually a viable option.

> [Jorgensens' Counsel]: First, there's the admission by Mr. Egbert in another proceeding that he actually intended to return to his residence that he was in before he was incarcerated. There is the—
>
> [Superior Court]: Isn't that the one that was burned down?
>
> [Jorgensens' Counsel]: That happened weeks ago. That happened on June 6th, the fire.
>
> [Superior Court]: The burning of his residence?
>
> [Jorgensens' Counsel]: Yes.

VRP (July 8, 2024) at 16-17.[4]

In addition to challenging the validity of the Egberts' alleged basis for evicting them, the Jorgensens also argued that there was ample evidence to support their theory that the Egberts' primary motive for evicting them was retaliation. They highlighted that the timing of the Egberts' 90-day notice was only two weeks after the demand letter from the Jorgensens' attorney. They also contended that Jackson's harassment of them supported their retaliation claim.

The Jorgensens further challenged the claim that Jackson and Scott had never received the demand letter or the notices from the county by pointing to the evidence that the P.O. Box on the letter and notices was registered to the Egberts.

---

[4] The record does not readily show that any party followed up on the superior court's question with additional information or argument.

No. 60448-5-II

C.  SUPERIOR COURT'S DECISION TO ISSUE A WRIT OF RESTITUTION

After hearing arguments and asking both parties questions, the superior court granted the

Writ of Restitution, but reserved ruling on all other issues, including any outstanding rent.  The

superior court first explained that it was viewing the facts in the light most favorable to the tenants,

so it would assume that the Egberts or Jackson (as Scott's power of attorney) had received the

Jorgensens' demand letter alleging that the Egberts were obligated to fix the septic system.

However, even assuming the receipt of the demand letter, the superior court determined

that it was not necessary for the case to proceed to a trial on the issue of immediate possession.

The superior court focused on the basis for the eviction—that Scott was going to live at the

residence—and reasoned,

> [W]e have a showing from the [Egberts]—and I would agree with the [Egberts']
> counsel that the showing is probably not going to be any different than the Court
> would ever see at the time of trial.  The [Egberts] are in control of the information
> that they would be presenting.  They presented their case well as to, yes, I have all
> sorts of places, but these are the reasons why I want to live in this one place.
>
> And so even if it were in a presumptive world, I think that they have defeated the
> issue and presented evidence that supports his desire to live in the residence, and
> the 90-day notice would be appropriate.
>
> . . . .
>
> I believe that the [Egberts] ha[ve] provided the Court with sufficient information
> for the Court to make a decision today that the 90-day notice was appropriate, that
> the 90-day notice was effective, and that the Writ of Restitution is appropriate
> today.

VRP (July 8, 2024) at 31-32.

The superior court emphasized its ruling was solely related to a writ of restitution and that

all other aspects of the dispute, including outstanding rent, would be determined later.

> [T]he Court will not be entering an order on outstanding rent today. This matter will—today was on a writ of restitution. And the matter can continue to be pursued with regard to outstanding rent.

VRP (July 8, 2024) at 35. The superior court reiterated it was reserving "the principal judgment amount," and "any issue as it relates to rent." VRP (July 8, 2024) at 38.

D. THE SUPERIOR COURT'S DECISION ON ATTORNEY FEES RELATED TO THE WRIT

The superior court then addressed the Egberts' declaration on attorney fees related to the Writ. The Jorgensens objected to the amount of the request, arguing that the Egberts' attorney "[was] charging attorney rates for administrative-type activities." VRP (July 8, 2024) at 36. The Egberts agreed to reduce the originally requested amount by $2,000. The Jorgensens' counsel made no further objection.

> [Egberts' Counsel]: You can strike the whole amount by $2,000.
> [Superior Court]: So take the 12,930 and subtract 2,000, is that what your suggestion is?
> [Egberts' Counsel]: That's my suggestion to keep it simple, and it actually benefits the tenants.
> [Superior Court]: Anything further, Mr. Bowers?
> [Jorgensens' Counsel]: No, Your Honor.

VRP (July 8, 2024) at 37. The parties, including the Jorgensens' counsel, reviewed and signed the superior court's changes to the proposed order.

VI. THE SUPERIOR COURT'S ORDER FOR A WRIT OF RESTITUTION

The superior court's written order was a pre-printed form entitled "Findings of Fact and Conclusions of Law, Judgment and Order for Writ of Restitution" that appeared to be proposed by the Egberts' attorney. CP at 281-85 (Writ of Restitution). The form included many line edits and strikeouts, but in the end, it largely mirrored the superior court's oral ruling by focusing on issuing

the Writ of Restitution and awarding related fees and costs. The order authorized the issuance of the Writ and listed the adjusted attorney fee amount of $10,930 and a costs amount of $1,912 and reserved on issues such as the principal judgment amount, damages, and the amount of any outstanding and owed rent.

But the order included some residual additional findings in a pre-printed, check-the-box type format. For example, finding 2.3 had boxes checked that stated that the Jorgensens had been issued both a 30-day notice to vacate and a 90-day notice to vacate. Other checked boxes in the finding included the following:

> Although the requisite time has elapsed since service of said Notice(s), Defendant(s) has/have not: **[ X ] paid the past due rent**, [ ] conformed to the obligations of tenancy, **[ X ] surrendered possession of the premises, and is/are now unlawfully detaining the premises.**

CP at 282.

The Jorgensens appeal.

## ANALYSIS

### I. UNLAWFUL DETAINER PROCEDURE

Unlawful detainer actions are statutorily created proceedings that are governed by chapters 59.12 and 59.18 RCW. *Garrand v. Cornett*, 31 Wn. App. 2d 428, 437, 550 P.3d 64 (2024). They provide "an expedited means to resolve competing claims of possession between landlords and tenants." *Id.* The scope of the proceedings is "narrow" and "limited to the question of possession and related issues such as restitution of the premises and rent." *Munden v. Hazelrigg*, 105 Wn.2d 39, 45, 711 P.2d 295 (1985).

For residential tenancies, "[t]he procedures set forth in the generalized unlawful detainer statutes, chapter 59.12 RCW, 'apply to the extent they are not supplanted by those found in [ch. 59.18 RCW,] the Residential Landlord-Tenant Act.'" *Randy Reynolds & Assocs., Inc. v. Harmon*, 193 Wn.2d 143, 156, 437 P.3d 677 (2019) (quoting *Hous. Auth. of City of Pasco & Franklin County v. Pleasant*, 126 Wn. App. 382, 390, 109 P.3d 422 (2005)).

Both the RLTA and the "generalized unlawful detainer statutes" are "strictly construed" in favor of tenants. *Id.* A landlord is limited to evicting a tenant based on an exclusive list of grounds prescribed by the RLTA. RCW 59.18.650(1)(a). Among the grounds for eviction, the statute provides that a landlord may evict a tenant if the owner intends to live at the premises. Specifically, the statute provides:

> (1)(a) A landlord may not evict a tenant, refuse to continue a tenancy, or end a periodic tenancy except for the causes enumerated in subsection (2) of this section and as otherwise provided in this subsection.
>
> . . . .
>
> (2) The following reasons listed in this subsection constitute cause pursuant to subsection (1) of this section:
>
> . . . .
>
> (d) The tenant continues in possession after the landlord of a dwelling unit in good faith seeks possession so that the owner or his or her immediately family may occupy the unit as that person's principal residence and no substantially equivalent unit is vacant and available to house the owner or [their] immediate family in the same building, and the owner has provided at least 90 days' advance written notice of the date the tenant's possession is to end. . . .

RCW 59.18.650. The owner's advance written notice must "identify the facts and circumstances" that support the landlord's cause for evicting the tenant. RCW 59.18.650(2)(d), (6)(b).

The statute further states that when evicting a tenant on this basis,

> [t]here is a rebuttable presumption that the owner did not act in good faith if the owner or immediate family fails to occupy the unit as a principal residence for at

least 60 consecutive days during the 90 days immediately after the tenant vacated the unit pursuant to a notice to vacate using this subsection (2)(d) as the cause for the lease ending[.]

RCW 59.650(2)(d).

If, after receiving notice the tenant still refuses to vacate the property, a landlord may file a complaint for an unlawful detainer action and, at the same time, move for a writ of restitution. *Harmon*, 193 Wn.2d at 156-57. A writ of restitution is a legal remedy, ordered by the superior court and issued by the clerk's office, that allows the landlord to regain immediate possession of the property pending the court's issuance of a final judgment. *See* RCW 59.18.380; *Webster v. Litz*, 18 Wn. App. 2d 248, 252-53, 491 P.3d 171 (2021) (explaining that after obtaining a writ of restitution, "the landlord is entitled to immediate possession of the property pending a final judgment").[5] "Whether or not the court issues a writ of restitution at the show cause hearing, if material factual issues exist, the court is required to enter an order directing the parties to proceed to trial on the complaint and answer." *Harmon*, 193 Wn.2d at 157.

II. SHOW CAUSE HEARING

To obtain a writ of restitution, the landlord must first obtain an order setting a show cause hearing. *Id.* A show cause hearing is a summary proceeding where the superior court evaluates the evidence presented by the parties and decides " 'the issue of possession pending a lawsuit.' " *Id.* (quoting *Carlstrom v. Hanline*, 98 Wn. App. 780, 788, 990 P.2d 986 (2000)). It "is not the final determination of rights in an unlawful detainer action." *Id.* Given its summary nature, a

---

[5] Prior to a writ being issued, the landlord must file a bond "conditioned that the [landlord] will prosecute his or her action without delay" and pay all costs and damages sustained by the tenant should it be determined that the writ was "wrongfully sued out." RCW 59.18.380.

show cause hearing must balance the tenant's right to have a " 'meaningful opportunity to be heard' " with " 'the government's interest in maintaining' efficient show cause hearings." *Leda v. Whisnand*, 150 Wn. App. 69, 83, 207 P.3d 468 (2009) (internal quotation marks omitted) (quoting *Carlstrom*, 98 Wn. App. at 790). As the court explained,

> Washington law simply does not countenance eviction of people from their homes without first affording them some opportunity to present evidence in their defense, but that right is not absolute: it is tempered by a grant of authority to trial courts to manage the scope and manner in which evidence is presented, rather than leaving it to the discretion of attorneys or pro se litigants.

*Id.* The expedited nature of show cause hearings benefits both landlords and tenants because it allows both parties to immediately challenge the other's claims of possession and present evidence. *See id.* (discussing the importance of allowing the parties, especially tenants, to meaningfully assert their defenses while also resolving the hearing expeditiously). And a prompt show cause hearing process provides tenants the opportunity to maintain housing stability and to avoid the costs of unnecessary eviction while the case is pending.

During a show cause hearing, the landlord has the burden of proving that they have the right to possess the disputed property by a preponderance of the evidence. *Garrand*, 31 Wn. App. 2d at 438. The RLTA expressly directs the superior court to orally "examine the parties and witnesses" and to evaluate the merits of the evidence presented. RCW 59.18.380; *Leda*, 150 Wn. App. at 83. Because the show cause hearing may be the tenant's "only true opportunity . . . to present evidence against immediate eviction," it is important that superior courts offer tenants the opportunity to present both written testimony and other evidence at the hearing. *Leda*, 150 Wn. App. at 84; *see also Garrand*, 31 Wn. App. 2d at 438 (" 'A show cause hearing must be meaningful,

19

as it is the first (and sometimes the only) step of the eviction process in which the tenant is able to participate.' " (quoting *Faciszewski v. Brown*, 187 Wn.2d 308, 321, 386 P.3d 711 (2016))).

The superior court undertakes its obligations at a show cause hearing in essentially two steps under the statute—first, it considers the right to possession; second, it considers "other relief." RCW 59.18.380. For the first step, following the superior court's mandatory examination of the parties and witnesses,

> *if it shall appear* that the [landlord] has the right to be restored to possession of the property, the court shall enter an order directing the issuance of a writ of restitution . . . restoring to the [landlord] possession of the property . . . .

RCW 59.18.380 (emphasis added). Otherwise, the issue of possession must be set for trial within 30 days. *Id.*[6] The lens through which the superior court makes a decision on this first step is unencumbered by anything other than whether it *appears* that the landlord has the right to be restored to possession.

The second step pertains to "other relief." "[R]egardless of whether the landlord is successful in obtaining the writ of restitution, the statute permits the landlord to seek 'other relief' as part of the unlawful detainer process, such as a final judgment for damages or termination of the tenant's lease." *Webster*, 18 Wn. App. 2d at 253 (quoting RCW 59.18.380). In other words, a superior court may issue a writ of restitution following a show cause hearing but still see the

---

[6] The statute provides:

> If it appears to the court that the [landlord] should not be restored to possession of the property, the court shall deny [the landlord's] motion for a writ of restitution and enter an order directing the parties to proceed to trial within thirty days on the complaint and answer.

RCW 59.18.380.

need for the remaining issues in the complaint and answer to proceed to trial. *See*, *e.g.*, *id.* (explaining that although it was undisputed that the superior court's issuance of a writ was proper, that the issue of damages should have been decided at a subsequent trial).

For step two, the statute imposes a different lens for the superior court's consideration that is more similar to summary judgment:

> *[I]f it shall appear to the court that there is no substantial issue of material fact* of the right of the [landlord] to be granted *other relief* as prayed for in the complaint and provided for in this chapter, the court may enter an order and judgment granting so much of such relief as may be sustained by the proof . . . [and] an order denying any relief sought by the [landlord] for which the court has determined that the [landlord] has no right as a matter of law . . . .

RCW 59.18.380 (emphasis added). The statute also specifically addresses whether a "genuine issue of material fact" could be brought up in a defense raised by the tenant.

> If it appears to the court . . . *that there is a genuine issue of a material fact* pertaining to a *legal or equitable defense or set-off raised* in the [tenant]'s answer, the court shall grant or deny so much of [landlord]'s other relief sought and so much of [tenant]'s defenses or set-off claimed, as may be proper.

*Id.* (emphasis added).[7] Unlike step one, for step two, the statute requires that the superior court consider "other relief" with a more defined lens by evaluating whether there are any substantial or genuine issues of material fact that require a trial.

---

[7] For example, "[a] tenant's testimony specifically disputing the breach of the lease alleged by the landlord creates issues of material fact warranting trial." *Webster*, 18 Wn. App. 2d at 254.

III. STANDARD OF REVIEW

The parties spend much of their briefing disputing the proper standard of appellate review for a superior court's decision following a show cause hearing.

The Egberts contend that an abuse of discretion standard should be applied to the superior court's decision of whether trial is necessary. The Egberts also contend that the superior court's findings of fact should be reviewed for substantial evidence.

In contrast, the Jorgensens argue that the appropriate standard of a review is de novo. They contend that during a show cause hearing the superior court is "only supposed to review the evidence and determine whether a genuine issue of material fact existed,"—it is not supposed to weigh evidence or enter factual findings like at a bench trial. Appellant's Reply Br. at 15-16. Thus, according to the Jorgensens, the abuse of discretion and substantial evidence standards are inappropriate.

The parties' dispute is not new. The appropriate standard of appellate review for show cause hearings has been debated among the divisions of the Court of Appeals. The two cases that appear to be at the center of this dispute are *Tedford v. Guy*, 13 Wn. App. 2d 1, 462 P.3d 869 (2020) and *Kiemle & Haygood Company v. Daniels*, 26 Wn. App. 2d 199, 528 P.3d 834 (2023). The two cases emphasize different portions of the RLTA's language and come to different conclusions.

In *Tedford*, the court highlighted the clause "*[i]f it appears to the court that there is a substantial issue of material fact*" from RCW 59.18.380 and interpreted the language to mean that "the [superior] court has the discretion to determine if trial is necessary." 13 Wn. App. 2d at 16 (emphasis added) (first alteration in original). This discretionary decision, according to *Tedford*,

22

means that an abuse of discretion standard is the appropriate standard to review "a [court's] decision to strike a trial date in an unlawful detainer action." *Id.*

The *Kiemle* court disagreed with *Tedford*. 26 Wn. App. 2d at 218-219. There, the court focused on the language "genuine issue of material fact" used in RCW 59.18.380 and reasoned that this "is nearly the identical language that governs summary judgment." *Id.* at 218. "Thus, it appears something close to de novo review should apply, at least when a tenant denies the landlord's grounds for eviction or raises an affirmative defense." *Id.* at 218-19.

We are hesitant to adopt the reasonings of either the *Tedford* or *Kiemle* courts. Neither opinion clearly acknowledges the differences in the statute's language when it discusses the first step, determining the right of possession, and the second step, determining "other relief." Instead, both decisions appear to blend the two steps into a single determination. Further, both courts end their analysis after considering only small portions of the language of RCW 59.18.380 without reconciling their position with the unique nature of unlawful detainer procedures and the practical realities of show cause hearings.

We especially question *Kiemle*'s creation of a de novo standard of review for superior court decisions made in show cause hearings. Although *Kiemle* accurately recognizes that the legislature mirrored the language of a summary judgment standard in some portions of RCW 59.18.380, it ignores other aspects of the statute and the general attributes of the unlawful detainer statutory scheme. Indeed, this statutory scheme places unique responsibilities on the superior court at show cause hearings. For example, as noted above, the statute requires the superior court to "examine the parties and witnesses orally." RCW 59.18.380. Without question, no similar procedure occurs at a summary judgment hearing.

Moreover, the entire scheme is designed for expedited resolutions, in part, to reduce costs for participants. *See Wilson v. Daniels*, 31 Wn.2d 633, 643-44, 198 P.2d 496 (1948). These interests force superior courts to exercise significant discretion, not only in the oral examination of the parties and witnesses, but also in the subsequent decision of whether a full trial, and the resulting delay, are necessary. To inform this decision, the superior courts must engage directly with the parties and witnesses (and specifically tenants who may have less access to legal resources or information) and assess the veracity of the various claims. One might readily imagine that this assessment could rise or fall on the subtleties of courtroom dynamics, such as body language, voice inflections, and other nonverbal cues related to credibility. Assessing the veracity of the information, both written and oral, provided by participants under a statutory scheme that values both expediency and efficiency while, at the same time, providing tenants a meaningful right to be heard, asks much of our superior courts at these hearings. A similarly comprehensive assessment is not necessary or even allowed for summary judgment motions. *Barker v. Advanced Silicon Materials, LLC*, 131 Wn. App. 616, 624, ("On motion for summary judgment the trial court does not weigh evidence or assess witness credibility."), *review denied*, 158 Wn.2d 1015 (2006). An abuse of discretion standard may more closely match these considerations, notwithstanding the use of summary judgment-type language in some aspects of the statute.

We do not decide whether an abuse of discretion standard is appropriate for *all* decisions made at a show cause hearing as this case presents only the singular question of what standard to apply to the first step under RCW 59.18.380—the superior court's decision regarding a writ of restitution. We hold, for the reasons explained above, that the appropriate standard for these decisions is abuse of discretion. We are unpersuaded by decisions, including *Kiemle*, that suggest

a de novo standard should be applied. We leave for another day which standard should be applied to the second step—the superior court decisions made at a show cause hearing about "other relief."

IV. APPLYING AN ABUSE OF DISCRETION STANDARD OF REVIEW

Applying an abuse of discretion standard here, we conclude that the superior court did not err when it authorized the issuance of a writ of restitution without a trial on that issue.

It is an abuse of discretion when a superior court's ruling is manifestly unreasonable or is based upon untenable grounds or reasons. *Taylor v. Ebenger*, 34 Wn. App. 2d 497, 505, 569 P.3d 340 (2025). A superior court's decision does not rise to the level of an abuse of discretion simply because the reviewing court might have decided the issue differently—it is an abuse of discretion only if " 'no reasonable judge would have reached the same conclusion.' " *State v. Comcast Cable Commc'ns Mgmt., LLC*, 16 Wn. App. 2d 664, 676, 482 P.3d 925 (2021) (quoting *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989)).

Here, the Jorgensens argue that the superior court erred, in large part, by failing to apply a rebuttable presumption of retaliation found in the RLTA. Under the RLTA, if a landlord initiates an eviction within 90 days of the tenant making a good faith, lawful demand for repairs, then there is a rebuttable presumption that the landlord's eviction notice was an act of retaliation against the tenant. RCW 59.18.250. The RLTA defines a "retaliatory action" as an action taken by the landlord, including eviction, that was "intended primarily to retaliate against a tenant because of the tenant's good faith and lawful" complaint or report to a government agency. RCW 59.18.240. But this rebuttable presumption of retaliation is conditional. For example, if at the time the landlord serves the tenant the eviction notice, the tenant is behind on rent or in breach of the lease

agreement, then "there is a rebuttable presumption . . . that the landlord's action is neither a reprisal nor retaliatory action against the tenant." RCW 59.18.250.

The Jorgensens contend that they established a rebuttable presumption that the Egberts issued the 90-day eviction notice for retaliatory purposes based on its timing—it was issued only two weeks after the Jorgensens' attorney sent them the demand letter. The Jorgensens assert that they "submitted ample evidence of retaliation" that undercut the Egberts' credibility and created a genuine issue of whether their acts were primarily retaliatory. Br. of Appellant at 22. The Jorgensens argue even if there are questions about paying rent that could create a rebuttable presumption in favor of the Egberts, there are genuine issues of material fact that require a trial.[8] According to the Jorgensens, "[d]isputes about retaliatory motive . . . will nearly always give rise to a genuine issue of fact" and necessitate trial. Br. of Appellant at 17. Thus, they claim that the superior court's decision to authorize the Writ of Restitution without a trial was error.

We are unpersuaded that the superior court abused its discretion. Given the specific basis for this eviction—the owner seeking to occupy the property—the superior court did not err when it determined that the Egberts were entitled to be restored to possession. The disputed issues, of which there are some, like outstanding rent, go to "other relief."

Both the narrowness of the superior court's order and the specific basis for the eviction are critical to this conclusion. First, as for the narrowness of the order, although the order came in the

---

[8] The Egberts argue that because the Jorgensens were behind on rent, there can be no presumption of retaliation and, in fact, the Egberts should receive a rebuttable presumption that their eviction action is *not* retaliatory. The Jorgensens respond that there remains a dispute as to whether they owed the Egberts rent and that "the court never made a factual determination regarding whether rent was owing." Br. of Appellants at 21-22.

form of a pre-printed order with checkboxes, the superior court's decision was limited essentially to the right of immediate possession. It authorized the issuance of the Writ of Restitution and awarded related fees and costs, but it expressly reserved its judgment on everything else, including the contested issue of outstanding rent. Considering that the superior court's order was limited to immediate possession and essentially reserved on "other relief," only the first step of RCW 59.18.380 is relevant to this appeal. Thus, it needed to only appear to the superior court that the Egberts had the right to immediately possess the property.

Second, as for the specific basis for the eviction, the eviction was based on RCW 59.18.650(2)(d) for owners to occupy the property as a primary resident, i.e., the property is where Scott says he wants to reside. Unlike other potential grounds for eviction, this basis would not generally be subject to competing positions and evidence from both parties. For example, when a landlord seeks to evict the tenant for reasons like breaching the lease, (e.g., committing waste or nuisance, or even failure to pay rent), those grounds are all rooted in the actions of the tenant. It is predictable that the viability of those reasons would be frequently disputed by the tenant with their own testimony, documents, and other evidence. But the owner/occupier basis for eviction is different. Where the owner wants to reside is wholly unrelated to the actions of the tenant, and only the owner would typically be in possession of evidence supporting that desire. And here, neither the reasoning for moving into the property nor the timing of Scott's need for housing is seriously disputed by the Jorgensens. The Jorgensens only offer evidence that at some point Scott intended to move into his previous residence and contend that his housing needs may not be the *primary* reason for the eviction. But no answer is apparent in the record to the superior court's questioning about fire damage to Scott's previous residence.

Moreover, allegations related to the septic, about which there are clearly issues of material fact, do not contradict the undisputed need for Scott to reside on the property at the precise time the eviction notice was issued (because of his discharge from WHS). The septic dispute could have direct relevance to issues of outstanding rent, but not to immediate possession due to the basis for this eviction.

In the end, the superior court reviewed the evidence and assessed that it *appeared* that the Egberts had the right to be restored to possession of the property without a trial. *See* RCW 59.18.380. As the superior court explained,

> [W]e have a showing from the [Egberts]—and I would agree with the [Egberts'] counsel that the showing is probably not going to be any different than the Court would ever see at the time of trial. The [Egberts] are in control of the information that they would be presenting. They presented their case well as to, yes, I have all sorts of places, but these are the reasons why I want to live in this one place.
>
> And so even if it were in a presumptive world, I think that they have defeated the issue and presented evidence that supports [Scott's] desire to live in the residence, and the 90-day notice would be appropriate.

VRP (July 8, 2024) at 31-32. We cannot say that no reasonable superior court would have made the same decision. *See Comcast*, 16 Wn. App. 2d at 676. Applying a deferential standard, we hold the trial court did not err.[9]

---

[9] Although it is not explicitly disputed by the parties, the superior court's order of attorney fees and costs related to the issuance of the Writ also survives. Even if the award of attorney fees and costs is considered to be "other relief," and even if this implicates de novo review instead of abuse of discretion, the record appears to show that the parties agreed that the fees were related to the order authorizing the Writ. And the Jorgensens raised no objection to the amount following the Egberts' agreement to reduce the total by $2,000.

Our decision may have been different if the superior court had decided to enter a judgment on additional "other relief" such as the amount of rent owed, damages, or offsets potentially made necessary for septic expenses. Given their nature, these issues would be much more likely to involve issues of fact, like the disputes about the septic system, consequences from the allegedly harassing behavior, or even potential issues related to a final determination of lease rights and permanent possession, that may require a trial to resolve. But here, the superior court specifically reserved its judgment on all issues beyond the issuance of the Writ of Restitution, making them outside the scope of this appeal.[10]

V. ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal under RAP 18.1.

We will award attorney fees under RAP 18.1 if applicable law entitles a party to recover attorney fees. RAP 18.1(a). The RLTA provides that "[t]he prevailing party may recover the costs

---

[10] The main thrust of the Jorgensens' appeal is that the superior court erred because it authorized a writ of restitution without a trial. But the Jorgensens also assign error to the superior court's finding of fact that "suggests" the Jorgensens owed rent. Br. of Appellant at 3. Specifically, they argue that substantial evidence does not support the superior court's finding 2.3 that "Defendant(s) has/have not: [X] paid the past due rent." Br. of Appellant at 29 (quoting CP at 289). They contend that the issue of outstanding rent was never decided by the superior court. We question whether this finding has any consequence (or whether it was just a product of a pre-printed form). But if it means anything, it is limited, and substantial evidence appears to support it. Evidence submitted (by both parties) supports the conclusion that some amount of rent had not been paid, including Hailey Jorgensen's declarations where she stated that she fell behind on rent and needed to apply for rental assistance three times in order to back-pay their rent for the period of December 2021 through June 2023; Jackson's and Scott's declarations that stated that the Jorgensens stopped regularly paying rent in December 2021; and a copy of a rental assistance check from February 2022.

of suit or arbitration and reasonable attorneys' fees." RCW 59.18.290. Thus, as the prevailing party on appeal, the Egberts are entitled to reasonable attorney fees on appeal.

CONCLUSION

We affirm and award attorney fees on appeal to the Egberts.

PRICE, J.

We concur:

MAXA, P.J.

LEE, J.